IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2013

## DERRICK SORRELL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 03-01955    John T. Fowlkes, Jr., Judge**

**No. W2012-01025-CCA-R3-PC  - Filed April 16, 2013**

The petitioner, Derrick Sorrell, appeals the post-conviction court's denial of his petition for post-conviction relief from his first-degree murder conviction, arguing he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Paul K. Guibao (on appeal) and Ryan Wiley (at hearing), Memphis, Tennessee, for the appellant, Derrick Sorrell.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Muriel Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The petitioner was convicted of one count of first-degree premeditated murder and one count of felony murder, arising out of his killing the victim, Mark Kent, while engaged in a drug deal. State v. Derrick Sorrell, No. W2006-02766-CCA-R3-CD, 2009 WL 1025873, at *1 (Tenn. Crim. App. Apr. 8, 2009), perm. app. denied (Tenn. Aug. 17, 2009). The trial court merged the convictions, and this court affirmed the judgments of the trial court on direct appeal. Id. The Tennessee Supreme Court denied the petitioner's application for permission to appeal. Id.

The underlying facts of the case were recited by this court on direct appeal as follows:

At trial, Officer Richard Jewell, Jr. testified that he received a call informing him that a person had been seen slumped over the wheel of a car near East Parkway and Young. The officer said that he arrived at the parking lot of the Sunshine Car Wash and observed a Dodge Avenger Coupe parked about three feet from a pay phone. The officer observed the victim leaning forward in the seat with what appeared to be a gunshot wound to the side of his face.

Officer Adam Merritt testified that there was blood and brain matter inside the vehicle and that he did not attempt to open the car doors because there were no signs of life.

Officer Jewell testified that they opened the vehicle when the Crime Scene Unit arrived. Inside the vehicle, they observed that the rear seat had been "flipped up" and noticed the victim's blood on the center console. Officer Jewell opined that the console and the glove box had indentations consistent with someone trying to force them open.

Officer David Galloway, with the Crime Scene Unit, testified that he found a spent .380 caliber bullet casing behind the front driver's seat. The officer also testified that, outside the vehicle by the passenger door, they found a white paper that appeared to have blood on it.

Jerry Sims, a retired latent print examiner, testified that the bloody fingerprint on the piece of paper found in the victim's car belonged to the [petitioner].

Doctor Teresa Campbell, who performed the victim's autopsy, testified that the victim had two gunshot wounds to the head, one to the right side of his face and one behind his ear at the base of his skull. The doctor testified that the victim had a stippling pattern on his face that indicated the gun had been discharged within two feet of his face. She determined that the cause of death was multiple gunshot wounds. The doctor testified that the wound to the face would not have caused an immediate death, but the wound to the base of the skull would have caused instantaneous death.

Tiffany Dotson testified that she had lived with the victim for six or seven years. She testified that she last saw the victim at approximately 10:00 p.m. when he left the house to wash her car, a 1996 Dodge Avenger. She

testified that she fell asleep, awoke about midnight, and realized the victim had not returned home. She called the victim on his cell phone but was unable to reach him. Dotson went back to sleep, woke up about 3:00 a.m., and again tried to call the victim. She said this was unusual and began to call the hospitals, the police, and the impound lot. She learned that her car had been involved in a homicide. She phoned the victim's father and told him what she knew. Dotson said that she listened to the voice mail messages from the victim's phone later that day and contacted the police to tell them she thought one message was important.

Officer James Fitzpatrick testified that he went to the scene of the homicide on June 19, 2001. He believed that the voice mail left on the victim's phone was an accidental recording. The officer said that the voice mail caught his attention because one of the individuals speaking said that he "searched up under his butt." The officer opined that someone had moved the victim around and searched underneath him. He further testified that he thought the conversation had something to do with the homicide.

Officer Fitzpatrick testified that he spoke with the [petitioner] on October 29, 2001, and took a written statement from him. Initially, the [petitioner] denied any knowledge of the killing. The officer told the [petitioner] that they had his fingerprint from the crime scene, and the [petitioner] denied that he had ever been to the car wash where the victim was slain. The [petitioner] eventually acknowledged that he had spoken with the victim and had made an appointment to meet him at the car wash at East Parkway and Young. The [petitioner] said he left before the victim was killed. The officer testified that he told the [petitioner] it would not be possible for him to have left before the victim was killed because the [petitioner]'s fingerprint inside the car was made in the victim's blood.

The [petitioner] told the officer that "David Covington" was the person who killed the victim. The [petitioner] explained to the officer that he had arranged to meet the victim to purchase two ounces of cocaine. The [petitioner] said he had forty dollars to buy the drugs and was concerned because forty dollars was typically not enough money to purchase one ounce of cocaine. The [petitioner] said that during their negotiation, David Covington opened the passenger side door of the car and fired two shots. The [petitioner] said that Mr. Covington ran around the car to the driver's side. The [petitioner] said that he went to his car and left the car wash.

In his formal statement, the [petitioner] denied shooting the victim. He maintained that David Covington shot the victim with a chrome .380 caliber pistol. The [petitioner] said he had known Covington for ten years. The [petitioner] told the officers that he had blood on his clothes and that he threw away his shirt but laundered his pants.

The officers played an audiotape for the [petitioner] that was made from the victim's voice mail messages. The recording was from an "accidental" phone call between two men. The recording contained a conversation about searching underneath the victim after he was killed. One officer testified that, after hearing the recording, the [petitioner] became agitated and his speech pattern became stuttered and accelerated. The officers asked the [petitioner] whom he was talking to, and he replied that he was talking to his cousin, Lorenzo Towns. When pressed about why he had told so many different stories about that night, the [petitioner] terminated his conversation with the officers.

Lieutenant Darrell Sheffield testified that he obtained a search warrant for the victim's cellular telephone after receiving information about the victim's voice mail. He received a detailed bill showing the phone numbers from calls received and placed on the victim's phone. The lieutenant was able to determine that the [petitioner] was the subscriber of the phone number used when the incident happened.

Tabitha Bender, an employee of Cricket Communications, testified that she reviewed the telephone records for both the victim and the [petitioner] for calls originating on June 18, 2001. She testified that the [petitioner] called the victim six times between 9:04 p.m. and 10:39 p.m. She testified that the victim phoned the [petitioner] one time, at 9:45 p.m.

Carolyn N. Cambers, an employee of the Shelby County Sheriff's Department, testified that she is responsible for recording telephone calls that originate from the county jail. A taped telephone call made by the [petitioner] was introduced into evidence where he tried to convince someone to tell the police that another person had killed the victim.

Derrick Sorrell, 2009 WL 1025873, at *1-3.

On June 21, 2010, the petitioner filed a *pro se* petition for post-conviction relief, in which he raised, among other things, various allegations of ineffective assistance of counsel.

The post-conviction court conducted an evidentiary hearing on January 6, 2011.

At the hearing, the petitioner testified that he suffered from paranoid schizophrenia and had been on medication for "a long time," including prior to his arrest and conviction. He had had mental health problems since he was young, and his mother abused him. He told counsel that he was on medication and was seeing a doctor in the jail, yet he was never sent for a mental evaluation. He was housed "in the suicide tank" at times. He told counsel he did not think he could testify due to the stress of being cross-examined by "a professional prosecutor."

The petitioner testified that his meetings with counsel were too short. At one particular meeting, he met with counsel and another attorney to discuss a plea, but his nerves were "messed up that day" and he had trouble understanding. He told counsel about his difficulties and asked for help. He admitted that he rejected a thirteen-year offer but explained that the "voices started talking to [him]" and "before [he] kn[e]w it, they had already set it for trial[.]" He received discovery from the State but did not understand all of it. Counsel tried to explain things to him but did not meet with him long enough for him to gain understanding.

On cross-examination, the petitioner testified that he did not tell counsel about his mental health issues, including his being diagnosed as paranoid schizophrenic. He stated that he did not tell counsel that he was hearing voices, although he did tell counsel that he was taking medication and that the medications were affecting him. However, he elaborated that he and counsel did not "discuss[] it long enough for [him] to get into it, because it is very hard to tell somebody that. You think that they are going to take advantage of you[.]" The voices in his head told him that counsel was not there to help him. He also did not tell the judge about the voices in his head because "the voices w[ere] crowding [him] out" and telling him that even the judge was against him. He later testified, inconsistently, that he did tell counsel that he was hearing voices.

Trial counsel testified that he took over the petitioner's case in 2005 after the petitioner's original attorney passed away. There was nothing in the original attorney's file to indicate the petitioner had a mental condition. There was an indication "[f]rom the intake, . . . at one time in the intake . . . that [the petitioner] had told them that he had seen a psychologist there and they asked him if he was under medication and if they had given him any and he said, no." Counsel was not aware of the petitioner ever being placed in the "suicide tank," or that would have triggered a mental evaluation. He said that he would only know about any medical treatment the petitioner received in jail if the petitioner told him about it. Questioned whether he asked the petitioner about any mental health issues, counsel explained:

What I did with [the petitioner] is like I do with everybody, I interview them numerous times and see if I believe that they are competent. Now, I am not a psychiatrist, but I can sit there and see, can they help me, can they tell me what is going on and he definitely could. The [petitioner] that I saw today is not the one that I saw a couple of years ago.

Counsel testified that he had multiple meetings with the petitioner, including one lengthy meeting in which they reviewed applicable portions of more than forty hours of jailhouse phone calls made by the petitioner. Counsel did not feel that the petitioner appeared "extremely erratic" in any of those phone conversations. Counsel said that he had worked in the public defender's office for several years and that they had a "special emphasis on mental health type issues and [was] . . . told, right off, to be especially sensitive to that." He said that the petitioner's thought process seemed "very quick" and that he "never heard anything about voices, or seeing people. I can assure you that."

On cross-examination, counsel recalled that the petitioner had no difficulty understanding when the trial judge explained to him about whether he wanted to go to trial, and counsel remembered the petitioner saying that the plea offer was too long and that he wanted to go to trial. Counsel did not have any problems communicating with the petitioner during trial. Counsel stated that, had he "any indication that [the petitioner] was not competent, or he was not able to make a decision then . . . I would have had him evaluated." He also noted that a number of other people in the public defender's office dealt with the petitioner, and there was no indiction in the file that anyone had detected a mental problem.

After the conclusion of the evidentiary hearing, the post-conviction court made oral findings, followed by a written order, denying post-conviction relief. The court found that the petitioner failed to prove his factual allegations by clear and convincing evidence and failed to show that counsel was ineffective or that he was prejudiced.

## ANALYSIS

The petitioner argues that he received the ineffective assistance of counsel at trial, specifically focusing on counsel's not seeking a mental evaluation.

Post-conviction relief is available to a petitioner who establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the post-conviction court "are entitled to substantial deference on appeal unless the evidence

-6-

preponderates against those findings." Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001); see also Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review is of purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields, 40 S.W.3d at 458; Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. Ordinarily, to establish that he was denied the effective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

The prejudice prong of the <u>Strickland</u> test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

Courts need not approach the <u>Strickland</u> test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; <u>see also</u> <u>Goad</u>, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

With regard to counsel's not requesting a mental evaluation, the court observed that the petitioner had not presented any documentation or examinations to show that he had a mental problem. The court also noted counsel's testimony that he did not observe in his numerous interactions with the petitioner any indication that the petitioner had a mental problem or "action would have been taken." The court determined that the petitioner's "credibility is just not good and those types of issues will have to be decided in favor of [counsel]." The court noted that "when [the petitioner] testified, he tried to make it seem as though he is having difficulty and hearing voices. Yet, he seems to communicate well with his attorney in the courtroom, as well as with court personnel." The court perceived that "[i]t just seems as though this is a case of malingering."

The record supports the post-conviction court's determinations. The petitioner did not obtain a mental evaluation or submit any documentation that supported his claim that he suffered from a mental problem. Counsel, an experienced attorney who was "especially sensitive" to looking for mental health issues, was not informed of and did not observe any indication that the petitioner was suffering from a mental health problem. The post-conviction court judged the credibility of the witnesses and determined the petitioner's testimony to be not credible, as was its province. The petitioner failed to prove that counsel performed deficiently or that any deficiency caused him prejudice.

We note that after the parties submitted their briefs in this case, the petitioner submitted a *pro se* brief, asserting that he was denied first-tier appeal of his original post-conviction petition, his conviction was based on evidence obtained pursuant to an unlawful arrest, and the caption in his indictment was fatally defective. We initially note that, in light of the fact that the petitioner is represented by counsel, we consider only counsel's appellate brief, and not that prepared and filed by the petitioner himself. <u>See</u> <u>State v. Lyons</u>, 29 S.W.3d 48, 51 (Tenn. Crim. App. 1999).

In any event, the petitioner suffered no prejudice as to his claim that he was denied first-tier appellate review of his post-conviction petition because his post-conviction counsel

did not file a timely notice of appeal because the record shows that the matter was addressed, new counsel was appointed to assist the petitioner on appeal, and this court has now thoroughly reviewed the petitioner's claims. With regard to his allegations of an unlawful arrest and defective indictment, such issues are waived because they were not presented on direct appeal. See Tenn. Code Ann. § 40-30-106(g) (stating that a ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE